## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SARAH JANE GRANT, )<br>Plaintiff, )<br> )<br> )<br>v. )<br> )<br>CAROLYN W. COLVIN, )<br>Acting Commissioner, )<br>Social Security Administration, )<br>Defendant. )<br>_____ ) | **CIVIL ACTION**<br>**NO. 13-13102-DHH** |

## DECISION

### Aug 20, 2015

Hennessy, M.J.

The Plaintiff, Sarah Jane Grant, seeks a remand of the decision by the Defendant, the

Commissioner of the Social Security Administration ("SSA"), denying her Disability Insurance

Benefits ("DIB") to the Administrative Law Judge.  (Docket #18).  Defendant seeks an

affirmation of the decision made by the Commissioner.  (Docket #23).  These motions are now

ripe for adjudication.  For the reasons stated below, Plaintiff's Motion to Remand is DENIED,

and Defendant's Motion to Affirm is GRANTED.

## PROCEDURAL HISTORY

Plaintiff protectively applied for DIB and Supplemental Income Benefits ("SSI") on

March 5, 2010 alleging disability beginning on July 15, 2007, due to anxiety and depression.

(Tr. 81, 141). Plaintiff's application for SSI was initially denied on April 14, 2010 due to

financial ineligibility.  (Docket # 29-1).  Plaintiff's application for DIB was initially denied on

July 20, 2010 on medical grounds.  (Tr. 83-85).  Plaintiff's application for SSI was also denied

on medical grounds on this date.  (Tr. 86-88).  Plaintiff filed for reconsideration of the denial of her claim(s) on September 11, 2010. [1]  (Docket # 29-2).  Plaintiff's application for reconsideration of her DIB claim was denied on January 5, 2011.  (Tr. 89-91).

Plaintiff applied for a hearing with the ALJ on March 1, 2011, which was characterized by the Social Security Administration as regarding a claim for "Title II Disability-worker or child only."  (Tr. 92).  Plaintiff's insurance status under the Act lapsed on December 31, 2011. (Tr. 20, 137).  After a hearing on May 10, 2012, (Tr. 37-79), the ALJ issued an unfavorable decision on June 28, 2012 in which the ALJ did not adjudicate Plaintiff's SSI claim.  (Tr. 16-33). The ALJ's decision became final on October 11, 2013, when the Appeals Council denied Plaintiff's request for review.  (Tr. 1-6).  Plaintiff has exhausted her administrative remedies, and this case is now ripe for review under 42 U.S.C. § 405(g).

## RELEVANT FACTS

A.  Background

Plaintiff was thirty-nine years old on the alleged onset date of her disability, and was forty-three years old on her date last insured.  (Tr. 137).  She has a high-school diploma, one and one-half years of college experience, and has past relevant work as a cafeteria counter attendant, housekeeper, and weaver.  (Tr. 48, 73-74, 154).

B.  Medical Evidence

I.   *Treatment Records and Medical Opinions*

On April 18, 2007, Plaintiff began receiving psychiatric treatment as an outpatient from

---

[1] There is a dispute between the parties over whether this application was for reconsideration of the denial of both Plaintiff's DIB and SSI claim or only the DIB claim.  (Docket #25 at 1-2, Docket #29).

Dr. James Bieber, M.D., for anxiety described by Dr. Bieber as being "high," and for panic attacks, which reportedly began in Plaintiff's mid-twenties.  (Tr. 231).  Plaintiff stated that she had just started a job at Starbucks.  (Id.).  Plaintiff reported drinking a bottle of wine per day at this time.  (Id.).  On examination, Dr. Bieber noted that Plaintiff was well groomed, cooperative, oriented, alert, and anxious, and had normal attention, memory, psychomotor activity, speech, thought content, and judgment.  (Tr. 232).  She also had average intellect and fair insight.  (Id.).  Dr. Bieber diagnosed Plaintiff with a panic disorder and assigned her a Global Assessment of Functioning ("GAF") score of 55. [2]  (Id.).  He prescribed Klonopin, which Dr. Bieber's report suggests helped manage Plaintiff's symptoms.  (Id.).

On May 24, 2007, Plaintiff reported to Dr. Bieber that she was feeling a lot of stress due to her new job at Starbucks, and that she almost had a panic attack at work.  (Tr. 233).  However, Plaintiff did report feeling more confident, because she was being told she was doing a good job. (Id.).  Dr. Bieber reported Plaintiff's progress towards her goal of relieving anxiety was "improving."  (Tr. 232-33).  Dr. Bieber added Zoloft to Plaintiff's prescribed medications.  (Tr. 233).  At a meeting on June 14, 2007, Dr. Bieber reported Plaintiff's anxiety persisted, that the Zoloft was helping, and that Plaintiff's progress towards goals was still "improving."  (Id.).

On September 7, 2007, Plaintiff reported to Dr. Bieber that she had left her job at Starbucks because it was too much pressure.  (Tr. 233).  She stated that she had just started her own home cleaning and organizing service, and was drinking less alcohol.  (Id.).  On September 21, 2007, at Plaintiff's request, Dr. Bieber discontinued her Zoloft prescription.  (Id.).  Plaintiff

---

[2] The GAF Scale is used for reporting a clinician's judgment of the individual's overall level of functioning and concerns psychological, social, and occupational functioning. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text revision 2000) ("DSM-IV-TR").  GAF scores in the 51-60 range indicate "moderate" symptoms or difficulty in functioning.  Id. at 34.

told Dr. Bieber during this meeting that she was feeling much better, committed to getting off alcohol, and had attended some AA meetings.  (Tr. 234).

On October 22, 2007, Plaintiff reported to Dr. Bieber that she was experiencing a lot of stress with some agitation and that she was trying to find ways to relax herself.  (Tr. 242).  Dr. Bieber noted that she had a partial response to current treatment and that no adjustment in treatment was necessary.  (Id.).

During a counseling session with Karen Stunkel, LMHC, on November 14, 2007, Plaintiff informed Stunkel that her cleaning business was growing, she had gained some good clients, and that she was especially enjoying working with elders.  (Tr. 277).  This was Plaintiff's second meeting with Ms. Stunkel, who, like Dr. Bieber, was part of Southboro Medical Group.  (Id.).  Plaintiff described drinking five cups of coffee a day and acknowledged that the caffeine affected her anxiety, but reported that her anxiety had decreased since she had become sober two months earlier.  (Id.).

On follow up with Ms. Stunkel on December 6, 2007, Plaintiff reported continued sobriety, and that work was going well.  Ms. Stunkel indicated that Plaintiff's response to current treatment, including medication and psychotherapy was satisfactory.  (Tr. 225-26).

On December 20, 2007, Plaintiff told Dr. Bieber that she was doing "pretty good," had been sober for the past three months, and her anxiety was manageable.  (Tr. 241).  Dr. Bieber concluded that Plaintiff had experienced a good response to current treatment.  (Id.).

At a psychotherapy session with Ms. Stunkel on January 30, 2008, Plaintiff reported that she had become pregnant and had mixed feelings about the pregnancy, including financial concerns.  (Tr. 223).  Plaintiff described feeling more relaxed after discussing her concerns with Ms. Stunkel.  (Id.).  Following the session, Plaintiff left a phone message saying she was feeling

much less anxious and that the session was helpful.  (Id.).  Ms. Stunkel reported good response to current treatment.  (Id.).

On follow up with Ms. Stunkel on February 14, 2008, Plaintiff reported that she felt very supported in therapy and recognized the importance of discussing her feelings.  (Tr. 222).  She questioned what she should do for a career change as she hated house cleaning, and stated she was considering pursuing employment as a dog walker.  (Id.).

Plaintiff continued counseling with Ms. Stunkel on a monthly basis, with the exception that no appointments occurred in May or June, until August 2008.  (Tr. 212-21).  During the sessions, Plaintiff and Ms. Stunkel discussed Plaintiff's anxiety concerning her pregnancy and problems with her boyfriend's behavior.  (Id.).  Ms. Stunkel consistently noted that Plaintiff had a good response to current treatment.  (Id.).  In August 2008, Ms. Stunkel noted that Plaintiff had taken Zoloft in the past with good results, and that Dr. Bieber had given her a new prescription for Zoloft, which she could possibly start after childbirth.  (Tr. 212).

Plaintiff returned to Dr. Bieber on April 1, 2010.  (Tr. 236).  Plaintiff reported that, for the past year, she had major anxiety and panic attacks without any medication.  (Id.).  Daily, she experienced palpitations and other bodily sensations related to anxiety.  (Id.).  Plaintiff expressed a desire to restart her medication and noted that she was close to weaning her son.  (Id.).  On examination, Dr. Bieber reported that Plaintiff was cooperative, quiet, shy, alert, and fully oriented, and had normal attention, intact memory, apprehensive mood, appropriate affect, normal psychomotor activity, halting/hesitant speech, logical/goal oriented thinking, average intellect, appropriate judgment, and adequate insight and impulse control.  (Tr. 237).  Plaintiff stated that she drank one glass of wine occasionally.  (Id.).  Plaintiff reported transient suicidal thoughts, but denied that she would act on them.  (Id.).  Dr. Bieber diagnosed panic disorder

without agoraphobia and assessed a GAF score of 55.  (Tr. 237-38).  He resumed Plaintiff's

Zoloft prescription.  (Tr. 238).

When Plaintiff returned to Dr. Bieber on April 29, 2010, she reported that the Zoloft was

helping her feel more calm and balanced, and Dr. Bieber noted that she had a satisfactory

response to current treatment.  (Tr. 235).

On November 9, 2010, Plaintiff underwent a physical with John Trundel, M.D.  (Tr.

296).  Dr. Trundel noted that Plaintiff's anxiety was controlled with Zoloft, and Plaintiff denied

any anxiety, depression, sleeping problems, or history of abuse.  (Tr. 296, 298).  On examination,

Dr. Trundel found that Plaintiff was alert and fully oriented.  (Tr. 298).

Plaintiff began outpatient psychiatric treatment with Olga Gaftanyuk, M.D., on

November 30, 2010.  (Tr. 406).  In a questionnaire dated June 7, 2011, Dr. Gaftanyuk opined that

Plaintiff had marked restriction of activities of daily living; marked difficulties in maintaining

social functioning; and marked deficiencies of concentration, persistence, or pace resulting in

failure to complete tasks in a timely manner.  (Tr. 280).  She also indicated that Plaintiff had

sustained four or more episodes of decompensation, each of extended duration.  (Id.).

On June 28, 2011, Plaintiff was admitted to Adcare Hospital for detoxification from

alcohol dependence after she reported drinking two bottles of wine daily for the last eight weeks.

(Tr. 313).  She complained of shakes, sweats, nausea, abdominal cramps, muscle cramps, aches,

chills, anxiety and depression.  (Id.).  Richard Ng, M.D., the attending physician, reported that

Plaintiff was alert and fully oriented with intact memory, appropriate judgment, and no thought

disorder, hallucinations, or suicidal ideation.  (Id.).  Dr. Ng's impression was alcohol dependence

and anxiety/depression.  (Id.).  Plaintiff was placed on a Librium and Ativan protocol for

detoxification.  (Tr. 314).  Plaintiff received daily nursing care and monitoring throughout her

hospital stay, and she engaged in a rehab program consisting of individual counseling and group therapy to work on gaining coping skills and identifying relapse triggers.  (Id.).  She attended groups and meetings and continued to work with her counselor on aftercare plans.  (Id.).  Plaintiff was discharged on July 8, 2011, with plans to continue outpatient treatment.  (Tr. 313-14).  Her medications at discharge included Zoloft, Cipro, and Motrin.  (Tr. 314).  Dr. Ng characterized Plaintiff's prognosis as fair to guarded depending on adherence to her continuing care plan.  (Id.).  Follow up notes from Adcare Outpatient Services indicate that Plaintiff did not return to treatment following discharge.  (Tr. 315).

On July 5, 2011, Dr. Gaftanyuk completed a Mental Residual Functional Capacity ("RFC") Questionnaire.  (Tr. 406-10).  Dr. Gaftanyuk noted that Plaintiff had a current GAF score of 55 with a high score of 65 in the past year.[3]  (Tr. 406).  Dr. Gaftanyuk indicated that Plaintiff was "unable to meet competitive standards" in the following mental aptitudes required by unskilled work: maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and work-week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; and deal with normal work stress.  (Tr. 408).  She also indicated that Plaintiff was "seriously limited, but not precluded" in the following areas: work in coordination with or proximity to others without being unduly distracted and accept instructions and respond appropriately to criticism from supervisors.  (Id.).  Dr. Gaftanyuk opined that Plaintiff's impairments would cause her to be absent from work about three days per month.  (Tr. 410).

---

[3] GAF scores in the 61-70 range indicate "some mild" symptoms or functional limitations, "but generally functioning pretty well, has some meaningful interpersonal relationships."  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text revision 2000) ("DSM-IV-TR").

On July 20, 2011, Plaintiff stated to Veronica Rusu, M.D., that she had remained sober and had excellent support from friends, neighbors, and psychotherapy.  (Tr. 324-25).  She reported that she had been doing well on an increased dose of Zoloft, and was motivated to change her life and remain productive.  (Tr. 325).  Dr. Rusu observed that Plaintiff was alert, oriented, very articulate, and a good historian.  (Tr. 326).

In a letter dated April 2, 2012, addressed to "Whom It May Concern," Dr. Gaftanyuk wrote: "[Plaintiff] has been struggling with severe anxiety, depression, sense of hopelessness and despair, inability to concentrate.  Even simple tasks present huge challenges for her, let alone working full-time." (Tr. 317).

In a May 2, 2012 questionnaire, completed in connection with Plaintiff's claim for DIB benefits, Dr. Gaftanyuk opined that Plaintiff could understand, carry out, and remember simple instructions, but could not, on a sustained basis, respond appropriately to supervision, coworkers, or changes in a routine work setting.  (Tr. 405).

In a letter dated May 15, 2012, Dr. Gaftanyuk wrote to the ALJ that Plaintiff "has very poor concentration, cannot perform a typical week or a typical day of work without interruptions from her psychiatric symptoms, and would be absent at least three days per month."  (Tr. 417).  She added: "I ask that you award her claim, as she is truly deserving of the benefits."  (Id.).

II.    *State Agency Assessments*

On July 7, 2010, Carol Montgomery, Ph.D., reviewed the available evidence and completed a Psychiatric Review Technique form.[4]  (Tr. 247-60).  She opined that Plaintiff had a severe impairment as of April, 2010, but that she did not expect it to last for twelve months.  (Tr.

---

[4]  At times in her brief, the Commissioner mistakenly refers to Dr. Montgomery as Dr. Cunningham. (Docket #29 at 5).

259).  She explained that Plaintiff "recently restarted treatment and is expected to have control over anxious symptoms within one year with moderate impairment."  (Id.).

Dr. Montgomery also completed a Mental RFC Assessment, which she noted reflected Plaintiff's projective functioning one year out from March 1, 2010.  (Tr. 243-45).  She opined that Plaintiff would have no limitation in understanding and memory; would be able to focus for a two-hour period during full workdays, and full workweeks, with occasional interference with her focus and efficiency from anxiety; would have socially appropriate behavior with the public and coworkers despite some social avoidance; and would have no limitation in adaptation.  (Tr. 243-45).

The record also contains a Psychiatric Review Technique form signed by Lawrence Langer, Ph.D, on January 3, 2011, indicating that there was "insufficient evidence" for a medical determination.  (Tr. 261).  Dr. Langer cited a statement from a disability examiner, Karen McCann, detailing her unsuccessful efforts to obtain updated treatment notes from Plaintiff.  (Tr. 273).  The statement concludes:

> Due to lack of current evidence this examiner is unable to determine if claimant's impairments are still severe but not expected to last and to assess if projected [mental RFC] is still appropriate.  Therefore case is considered to be [insufficient evidence].  Unable to determine if [claimant] meets or equals any listing.

(Id.).

C.  Non-medical Evidence

In an April 2010 Function Report, Plaintiff described her daily activities as follows: "shower, bathe my son, make breakfast for my son [and] I, take my son for a walk in stroller, make lunch for my son [and] I, put my son down for a nap, clean house [and] do laundry while he sleeps, prepare dinner, watch TV [and] go to bed."  (Tr. 163).  She added: "Because I am subject to panic attacks even with medication, I am at times unable to do even these things."

(Id.).  Plaintiff noted that she did "everything" for her eighteen-month-old son, though her partner helped with childcare.  (Tr. 165).  She reported that her high anxiety caused extreme sleeplessness, but she noted no problems with personal care.  (Id.).  She denied needing any special reminders to take care of her personal needs.  (Tr. 166).  She reported preparing simple meals, cleaning, doing laundry, ironing, dish washing, and sweeping and mopping the floor on a daily basis.  (Id.).

Plaintiff described going outside "almost daily" and driving a car.  (Tr. 167).  She reported that she could go out alone, but cautioned that if she were overtaken by a panic attack while out, she would have to return home immediately.  (Id.).  She described going grocery shopping when her anxiety allowed.  (Id.).  Plaintiff stated that she was able to pay bills, count change, handle a savings account, and use a checkbook/money orders.  (Id.).  She identified no hobbies or interests and denied socializing with others.  (Tr. 168).  She described going to the library on a regular basis for baby books.  (Id.).  She wrote: "I avoid social contact whenever possible.  I have panic attacks when [with] others, whether family or strangers."  (Tr. 169).  She alleged that when having panic attacks she was unable to concentrate or understand what was said to her.  (Id.).  She indicated that she did not finish what she started, felt overwhelmed with larger tasks, and could follow spoken instructions when calm.  (Id.).  She reported being very intimidated by authority figures, but denied ever having been fired or laid off from a job due to problems getting along with others.  (Tr. 170).  She noted that she did not handle stress or changes in routine well.  (Id.).

## ALJ DECISION AND FINDINGS

In assessing Plaintiff's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled

to benefits.  See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690

F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he or she

has engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  The ALJ found that

Grant had not engaged in substantial gainful activity from her alleged onset date of July 15, 2007

through her date last insured of December 31, 2011.  (Tr. 21).

At the second step, the ALJ must determine whether the claimant has a medically

determinable impairment or combination of impairments that is "severe."  20 C.F.R.

§ 404.1520(a)(4)(ii).  The ALJ determined that Grant had the following severe impairments:

depressive disorder, anxiety disorder, post-traumatic stress disorder, and alcohol dependence in

intermittent remission.  (Tr. 21).

Third, the ALJ must determine whether the claimant has impairments that meet or are

medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the

Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment

that meets or equals one of the impairments listed in Appendix 1, and meets the duration

requirement, then the claimant is disabled.  Id.  The ALJ found that Grant did not have an

impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1

impairment.  (Tr. 22).

At the fourth step, the ALJ considers the claimant's RFC and the claimant's past relevant

work.  20 C.F.R. § 404.1520(a)(4)(iv).  Whenever there is a determination that the claimant has a

significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the

claimant's RFC.  20 C.F.R. § 404.1520(e).  An individual's RFC is her ability to do physical and

mental work activities on a sustained basis, despite limitations from her impairments.  20 C.F.R.

§ 404.1545(a)(1).  Here, the ALJ found:

> [Grant] had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:  The claimant had been able to perform work that involved simple one to two step tasks, taught primarily by demonstration, and with rare changes in routine. She had been able to perform work that was performed in relative isolation. The claimant had been limited to work that involved interaction with a supervisor one to two times every four hours, and otherwise allowed her to be left to her own devices.

(Tr. 23).

The ALJ determined that, based upon claimant's RFC and the testimony of the vocational

expert, that the claimant was capable of performing past relevant work as a weaver and

housekeeper.[5]  (Tr. 32).  For several months after alleged onset date, Plaintiff operated her own

cleaning business.  (Tr. 25).  Accordingly, the ALJ found that Grant was not disabled at any time

from July 15, 2007 through December 31, 2011.  (Id.).

## **STANDARD OF REVIEW**

The District Court may enter "a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where

they are supported by substantial evidence and the Commissioner has applied the correct legal

standard.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence

exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as

---

[5] However, the only job the vocational expert testified Plaintiff could perform with all of the limitations the ALJ adopted in his RFC finding was housekeeper.  (Tr. 75).  Nonetheless this is harmless error, because a claimant need only be able to perform one past relevant job to be found not disabled at step four.  See Gray v. Heckler, 760 F.2d 369, 371-72 (1st Cir. 1985) (upholding the ALJ's step four finding where the ALJ found that claimant could perform only one of several past relevant jobs).

adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the court must uphold the Commissioner's findings when they are supported by substantial evidence. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991). The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence. Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003). Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process. Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982). This includes the burden of establishing her RFC. 20 C.F.R. § 404.1512(c).

## DISCUSSION

Plaintiff claims that the ALJ's decision is not supported by substantial evidence, and that the ALJ made several errors of law in rendering his decision. (Docket #19 at 1-2). Plaintiff argues that the ALJ erred in failing to adjudicate Plaintiff's SSI claim, improperly dismissed the medical opinion of Dr. Gaftanyuk, failed to ground his RFC in expert medical opinion, misapplied the SSA's durational requirement concerning Plaintiff's impairments, erred procedurally in evaluating the materiality of Plaintiff's alcohol abuse, and elicited and relied upon invalid testimony from the vocational expert. (Docket #19 at 1-2; Docket #25 at 1). For

these reasons, Plaintiff seeks a remand of the case for further findings by the Commissioner.  (Id. at 2).  The Commissioner opposes these arguments and seeks to affirm the ALJ's decision. (Docket #24 at 11-19).

      *I.*    *The ALJ Did Not Err in Failing to Adjudicate Plaintiff's SSI Claim.*

     Plaintiff argues that this case involves both a claim for SSI and DIB.  (Docket #25 at 1). Plaintiff advances three arguments in support of this contention.  First, Plaintiff argues that the Commissioner has waived her right to dispute this contention, as it had been pled in Plaintiff's complaint and admitted in the Commissioner's answer.  (Id.).  Second, Plaintiff argues, "It is hard to imagine how a claimant could request a redetermination of Title II benefits without also requesting one of her Title XVI benefits."  (Id. at 2).  Finally, Plaintiff's theory of why her SSI claim was not before the ALJ suggests that SSA personnel improperly filled out their portion of the ALJ hearing request form and, in doing so, improperly limited the hearing to a Title II claim only.  (Id.).  For the following reasons, Plaintiff's arguments fail.

     First, it is true that the Commissioner admits paragraph six of Plaintiff's complaint, which states, "Plaintiff's applications were denied by notices issuing on July 20, 2010.  She made a timely request for reconsideration."  (Docket #1 at ¶ 6).  However, Plaintiff ignores the fact that Commissioner clearly contended in both her answer and principal brief that the case included a DIB claim, but not an SSI claim.[6]  (Docket #16 at 1; Docket #24 at 1 n.1).   In addition, it is not clear that the phrase "request for reconsideration" in paragraph six of Plaintiff's complaint refers to a request for reconsideration of both a DIB and SSI claim.  The Commissioner could have read the reconsideration request as referring to Plaintiff's request for

---

[6] The Commissioner states in her answer, "Defendant denies that this appeal involves a final decision on Plaintiff's application for Supplemental Security Income[.]"  (Docket #16 at 1).  The Commissioner states in the first footnote of her principal brief, "[T]he SSI claim is not part of the Commissioner's final decision now on review before the Court."  (Docket #24 at 1 n.1).

reconsideration of her DIB claim only.  The Commissioner did not waive her right to contest the SSI issue.

Plaintiff's second argument is, as the Commissioner asserts, mere conjecture.  Plaintiff may or may not have had good reasons to appeal denial of her SSI claim.  Plaintiff's subjective intentions cannot be objectively determined by this court and are not dispositive of this issue.

Finally, with respect to Plaintiff's theory concerning the application for a hearing with the ALJ, even it is possible that the SSA mistakenly limited the appeal to only a Title II DIB claim. Plaintiff and her counsel had an adequate opportunity to correct such mistake and failed to do so. On February 19, 2011, when Plaintiff completed the request for a hearing, she was unrepresented by counsel.  (Tr.  92). However, Plaintiff retained counsel on March 23, 2012.  (Tr. 119). According to 20 C.F.R. § 404.938(a), a plaintiff will receive notice of her hearing with the ALJ at least twenty days in advance of that hearing.  In this case, Plaintiff was notified on February 2, 2012 of a hearing to occur on May 10, 2012.  (Tr. 95).  This notification contained a summary of the issues the ALJ would consider, and notified the Plaintiff that if she had any objections to the issues to be adjudicated, she must inform the ALJ in writing as soon as possible after receiving the notice.  (Tr. 97-98).  The notification states, "The hearing concerns your application…for a Period of Disability and Disability Insurance Benefits."  (Tr. at 97).  No mention of an SSI claim is made.  (Id.).  This instruction is consistent with the rule stated in 20 C.F.R. § 416.1439.

As the record shows, Plaintiff had nearly three months' notice of the ALJ hearing. Although Plaintiff was unrepresented by counsel when she filed the application for a hearing with the ALJ, she retained counsel more than twenty days prior to the hearing.  Counsel had adequate time to state any objections to the issues to be adjudicated by the ALJ, but failed to do so.  Plaintiff's counsel also failed to raise an objection to the ALJ's failure to adjudicate the SSI

claim during the ALJ hearing itself.  (Tr. 39).  At the start of the hearing, the ALJ stated, "This is a hearing involving the application of Sarah Jane Grant for a period of – no, excuse me, for a supplemental security income benefits.  No, no, no.  I was right.  It is a period of disability[.]" (Id.).  Plaintiff's counsel did not attempt to correct the ALJ when he made this statement.  (Id.).

For these reasons, I find the ALJ did not err in failing to adjudicate the SSI claim.[7]

II.     *The ALJ's Opinion Was Supported by Substantial Evidence*

A.   The ALJ Did Not Err in Assigning Little Weight to Plaintiff's Treating
Physician Opinion or in His Consideration of Plaintiff's Assigned GAF scores

The ALJ stated that he afforded little weight to the opinion of Dr. Gaftanyuk, Plaintiff's treating physician.  Plaintiff argues in her principal brief that the ALJ improperly dismissed the uncontroverted medical opinion of Dr. Gaftanyuk and failed to offer good reason for the weight he assigned to that opinion, in violation of 20 C.F.R. § 404.1527.  (Docket #19 at 1).  Plaintiff further argues that the ALJ erred when he focused on the GAF scores, which she claims the ALJ placed heavy reliance on in finding her not disabled.  (Id. at 12).  For the following reasons, Plaintiff's arguments fail.

A treating physician's opinion as to the nature and severity of a claimant's impairments is entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  When an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must consider the following factors to determine what weight to actually give the opinion: the length, nature, and extent of treatment and the frequency

---

[7] Plaintiff argues that because the SSI claim was properly before the ALJ,  the Commissioner's failure to include Plaintiff's SSI reconsideration form in the record is a violation of her duty to assemble and transmit a complete record of the administrative proceedings to the Court under 42 U.S.C. 405(g).  (Docket #25 at 2).  Because the SSI claim was not before the ALJ, the Commissioner did not abrogate her duty and no remand is required.

of the examination; supportability of the opinion by evidence; consistency with the record; the

specialization of the treating source; and any other relevant factors which support or contradict

the opinion.  20 C.F.R. § 404.1527(c)(2)-(6); see Rodriguez Pagan v. Sec'y of Health & Human

Servs., 819 F.2d 1, 3 (1st Cir. 1987) (holding that ALJ was not required to assign treating

physicians' opinions controlling weight because the opinions were based excessively on

claimant's subjective complaints, rather than on objective medical findings).  "When a treating

doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of

'controlling weight' does not apply."  Shaw v. Sec'y of Health & Human Servs., No. 93-2173,

1994 WL 251000, at *3 (1st Cir. June 9, 1994); see Leahy v. Raytheon, 315 F.3d 11, 21 (1st Cir.

2002) ("When other evidence sufficiently contradicts the view of a treating physician, that view

appropriately may be rejected").

Before finding Dr. Gaftanyuk's opinion that claimant could not be employed in a full-

time capacity based on her psychiatric impairments inconsistent with other medical

documentation, the ALJ described Dr. Gaftanyuk's opinion that Plaintiff experienced marked

restrictions of activities in daily living, maintaining social functioning, concentration, persistence

or pace, and would experience four or more repeated episodes of decomposition.  (Tr. 29).  He

further related that Dr. Gaftanyuk determined that Plaintiff would be unable to meet competitive

standards in a variety of categories and therefore would be unable to complete a regular workday

or work-week.  (Tr. 29-31).  While Plaintiff that Dr. Gaftanyuk's medical opinion is

"uncontroverted," the record shows otherwise.  Other substantial evidence is squarely at odds

with Dr. Gaftanyuk's opinion. For instance, Dr. Montgomery, a state medical examiner, opined

that Plaintiff had merely mild restriction of activities of daily living with marked difficulties in

maintaining social functioning, moderate difficulties in maintaining concentration, persistence or

pace, and would experience no episodes of decomposition.  (Tr. 31).  Dr. Montgomery also

opined that Plaintiff would have no more than moderate limitations and would not be

significantly limited in most areas of work functioning.  (Tr. 29-31).  In addition, the ALJ

thoroughly recounted medical records from Dr. Bieber and Ms. Stunkel documenting the fact

that Plaintiff's impairments were well-controlled with medication and therapy.  (Tr. 25-27, 30).

      With respect to Plaintiff's GAF scores as assigned by Dr. Gaftanyuk, the ALJ reasonably

determined that those scores undermined Dr. Gaftanyuk's opinion that Plaintiff would

experience marked restrictions in a variety of activities.  (Tr. 30).  The ALJ cited to Dr.

Gaftyanuk's assigned scores of 55, and 65, which indicate Plaintiff experienced only

"moderate," and even mild, symptoms or difficulty in functioning.  (Id.).  The ALJ additionally

recounted scores assigned by other, non-treating physicians on several occasions between April

2007 and April 2010.  (Tr 25-30).  These GAF scores similarly fell between 55 and 65.  (Id.).

The ALJ is permitted to consider the GAF scores.  See Gonzalez-Rodriguez v. Barnhart, 111

Fed. Appx. 23, 25 (1st Cir. 2004) (recognizing that the GAF rating system "provides a way for a

mental health professional to turn raw medical signs and symptoms into a general assessment,

understandable by a lay person, of an individual's mental functioning.") (citing Howard v.

Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) (noting that GAF scores can provide

"considerable help" in assessing an RFC)).  While an ALJ is not permitted to draw an inference

from any difference in assigned scores from physician to physician or from a sole score on its

own, the ALJ in this case did neither.  Hall v. Colvin, 18 F. Supp. 3d 144, 154 (D.R.I. 2014)

(stating "adjudicators cannot draw reliable inferences from the *difference* in GAF ratings

assigned by different clinicians *or* from a *single* GAF score in isolation.") (quoting AM-13066)

(emphasis added).  In addition, contrary to Plaintiff's claim, the ALJ did not place heavy reliance

on the GAF scores, but supportably considered them in addition to other medical evidence cited above, and to non-medical documentary evidence cited below.

The ALJ also reasonably found Plaintiff's activities of daily living to be inconsistent with the alleged severity of Plaintiff's impairments, as found by Dr. Gaftanyuk. (Tr. 25). Plaintiff's testimony indicated that she had no issues addressing personal needs, preparing her own meals, and performing household chores. (Tr. 24). Plaintiff stated that she went outside almost daily, could travel on foot or drive, and could travel alone. (Id.). Plaintiff testified that she could pay bills, handle a savings account, and use a checkbook. (Id.). In addition, the record indicates that Plaintiff worked as a housekeeper prior to the alleged onset date. (Tr. 25).

Accordingly, I find that the ALJ did not err when he assigned little weight to Dr. Gaftanyuk's opinion.

## B. The ALJ Grounded His RFC Finding on Expert Medical Opinion

Plaintiff argues that the ALJ failed to ground his decision in expert medical evidence. (Docket #19 at 14). Plaintiff contends that the expert opinions of Dr. Montgomery and Dr. Langer did not support the ALJ's RFC finding. (Id.). Because Dr. Gaftanyuk's opinion was rejected, Plaintiff contends the ALJ's RFC assessment was unsupported by an expert physician. (Id.). For the following reasons, Plaintiff's arguments fail.

When a claimant puts into issue functional loss that precludes performance of certain work activities, the ALJ has an "obligation to measure the requirements of former work against the claimant's capabilities; and, to make that measurement, an expert's RFC evaluation is ordinarily essential, unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 6-7 (1st Cir. 1991). However, the "ALJ, as a layperson, is generally not qualified to interpret raw

medical data in order to determine a claimant's RFC." <u>Manzo-Pizarro v. Sec'y of Health &</u>
<u>Human Servs.</u>, 76 F.3d 15, 17 (D. Mass. 1996).  Therefore, a hearing officer's determination of a
claimant's RFC without any assessment by an expert is unsupported by substantial evidence, and
must be remanded for the taking of further functional evidence.  <u>Perez v. Sec'y of Health &</u>
<u>Human Servs.</u>, 958 F.2d 445, 446 (1st Cir. 1991).

       In this case, the ALJ afforded "some, but not great weight" to the opinions of Drs.
Montgomery and Langer because they were rendered by consultants who did not have the
opportunity to examine, meet with, or question the claimant.  (Tr. 32).  The ALJ did find the
opinions to be useful and informative.  (Tr. 31).  Dr. Montgomery's opinion, rendered in June
2010, suggested that Plaintiff's condition was severe, but would improve with treatment within
twelve months.  (<u>Id.</u>).  Dr. Langer opined on January 3, 2011 that he could not determine, based
on a lack of current evidence, whether or not this projected RFC was still appropriate.  (<u>Id.</u>).

       Plaintiff contends that Dr. Montgomery's RFC assessment did not concern Plaintiff's
capacity at that time based on current evidence, but was a projection of how the Plaintiff might
respond to treatment.  (Docket #19 at 14).  Plaintiff seems to suggest that that the ALJ cannot
rely on Dr. Montgomery's opinion for this reason.  (<u>Id.</u>).  However, as the Commissioner
contends, Plaintiff cites no authority suggesting the ALJ was not entitled to consider Dr.
Montgomery's assessment.  To the contrary, as cited by the Plaintiff, 20 C.F.R. § 404.1527(e),
states, "administrative law judges must consider findings and other opinions of State agency
medical and psychological consultants and other program physicians, psychologists, and other
medical specialists as opinion evidence except for the ultimate determination about whether
[claimants] are disabled."  20 C.F.R. § 404.1527(e)(2)(i).  In this case, Dr. Montgomery assessed
on July 7, 2010 that Plaintiff had disabling symptoms as of April, 2010 and therefore had to

make a determination whether Plaintiff's symptoms and limitations would last twelve months

from April, 2010. (Tr. 247-260).  This was necessary to determine whether Plaintiff met the

statutory durational requirement that Plaintiff's symptoms and or disabling level limitations

would last for twelve continuous months.  20 C.F.R. § 404.1509; see Barnhart v. Walton, 535

U.S. 212, 214-22 (2002).  Courts have previously found an ALJ's consideration of a projected

RFC appropriate under similar circumstances.  See Reese v. Astrue, 2009 WL 499601, at * 9

(S.D. Ind. 2009) (finding an ALJ properly considered state-agency physician's projected RFC

where claimant's alleged onset date was less than twelve-months prior to the state-agency

physician's assessment); see also Nelson v. Barnhart, 2006 WL 2303108, at *5 (E.D. Pa. 2006)

(recognizing "the significance of a 'projected RF'" based on anticipated improvements[.]).

     Plaintiff further objects to the ALJ's RFC by arguing that even if Dr. Montgomery's RFC

opinion was properly considered by the ALJ, the ALJ would have to conduct an independent

analysis of evidence in the record which came subsequent to Dr. Montgomery's opinion.

(Docket #25 at 6-7).  However, as the Commissioner argues, the medical evidence of the record,

including the opinion evidence of Dr. Bieber and Ms. Stunkel and GAF scores assigned by both

Drs. Bieber and Gaftanyuk, bore out Dr. Montgomery's projected RFC indicating that Plaintiff's

condition would improve with treatment.  See Ferland v. Astrue, No. 11-cv-123-SM, 2011 WL

5199989, at *4 (D.N.H. Oct. 31, 2011) (finding "an ALJ may rely on such an opinion where the

medical evidence postdating the reviewer's assessment does not establish any greater

limitations…or where the medical reports of claimant's treating providers are arguably

consistent with…the reviewer's assessment) (citations omitted).  In addition, Dr. Langer's

opinion is arguably not inconsistent with Dr. Montgomery's opinion, as there was little new

medical evidence postdating Dr. Montgomery's opinion for Dr. Langer to consider.  The ALJ did not fail to base his RFC assessment on expert medical evidence.

III.     *The ALJ did not Misapply the Durational Requirement*

Plaintiff argues that the ALJ erroneously applied the durational requirement that a claim must persist for twelve months or more.  (Docket #19 at 2).  Plaintiff argues that the ALJ's statement of the rule contradicts 20 C.F.R. Subpart P, Appendix I Rule 12:00(D)(2) and the ALJ failed to meet his obligations under this rule.  (Id. at 16).  For the following reasons, Plaintiff's arguments fail.

In order for a plaintiff to be considered disabled, a plaintiff's impairment(s) and subsequent disabling limitations "must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509; see Barnhart, 535 U.S. at 214-22 (upholding the SSA's interpretation that the Act's durational requirement applies to a plaintiff's inability to work as a result of her impairments as well as a plaintiff's impairments themselves).  Proper evaluation of the level of functioning of a claimant with mental impairments requires longitudinal evidence, and it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish the severity of a claimant's impairment.  20 C.F.R. Subpart P, Appendix I Rule 12:00(D)(2).

The ALJ stated it was the Plaintiff's burden to "establish limitations at a disabling level for 12 continuous months[.]"  (Tr. 30).  I find that this statement of law was not in error in light of the Supreme Court's ruling in Barnhart.  In addition, the ALJ, as previously discussed, thoroughly recounted Plaintiff's medical treatment over the relevant period in finding her condition to be well-controlled with proper treatment.  (Tr. 25-29).  The ALJ properly considered

longitudinal evidence from the relevant period in determining the Plaintiff's impairment severity in compliance with 20 C.F.R. Subpart P, Appendix I Rule 12:00(D)(2).

IV.     *The ALJ's Misapplication of the Rules Concerning Substance Abuse were Harmless Error*

Plaintiff argues that the ALJ erred in evaluating the impact of Plaintiff's alcohol abuse on her disabled status.  (Docket #19 at 17-18).  Plaintiff contends that the ALJ must first determine whether a claimant is disabled while abusing alcohol or drugs, and then determine whether claimant would still be found disabled absent any substance, abuse in accordance with 20 C.F.R § 404.1535.[8]  (Docket #19 at 18).  Plaintiff asserts that the ALJ collapsed this multi-step analysis into a single step, and that doing so requires remand.  (Id.).  Plaintiff's argument fails.

Plaintiff is correct in asserting that 20 C.F.R. § 404.1535 requires an adjudicator to first determine whether or not a claimant abusing alcohol is disabled before determining whether that claimant would still be disabled absent that substance abuse.  However, the question of whether the ALJ actually erred procedurally need not be addressed.  Regardless of whether or not the ALJ failed to conduct a proper analysis of Plaintiff's alcohol abuse, there is a burden on the Plaintiff to show, if there was an error, that the Plaintiff was harmed as a result.  See Shineski v. Sanders, 556 U.S. 396, 409 (2009) (holding that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").  In this case, the ALJ properly considered the one instance during the relevant time period when Plaintiff was abusing alcohol.  (Tr. 28).  This was the eight week period prior to Plaintiff's Adcare admission on June

---

[8] Plaintiff further argues that there is a six-step analysis that adjudicators must conduct before making a finding concerning a claimant's drug or alcohol abuse in order to comply with the Commissioner's policy as stated in 78 Fed. Reg. 11939-01, 11941-11942 (Feb. 20, 2013). (Docket #19 at 18).  However, as the Commissioner correctly points out in her response, this policy did not become effective until March 22, 2013, which was well after the ALJ rendered his decision in this case.  78 Fed. Reg. 1139-01, 11939 (Feb. 20, 2013).

28, 2011.  (Id.).  Again, the ALJ accurately and thoroughly recounted Plaintiff's medical history

in supportably finding that Plaintiff was not disabled and that her condition was well-controlled

with proper treatment throughout this time period.  (Tr. 25-29).  The ALJ considered the Plaintiff

to be not disabled despite alcohol abuse during this period.  Plaintiff has not met her burden of

showing that any harm resulted from the ALJ's alleged error.  For this reason, Plaintiff's

argument fails and no remand is required on this issue.

     V.    *The ALJ Did Not Err in Eliciting Vocational Testimony from the Vocational Expert.*

     Plaintiff argues that the ALJ erred by eliciting invalid vocational testimony, unsupported

by substantial evidence in the record, which he then relied upon in finding the Plaintiff not

disabled.  (Docket #19 at 2).  Plaintiff asserts that the vocational expert testified that a claimant

with Dr. Gaftanyuk's described limitations would not be able to sustain any employment.

(Docket #19 at 20).  Therefore, Plaintiff asserts remand is required.  Plaintiff's argument fails.

     The opinion of a vocational expert that a Social Security claimant can perform certain

jobs qualifies as substantial evidence.  Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass.

2011).  However, in order to be substantial evidence, the opinion of the vocational expert must

be in response to a hypothetical that accurately describes the claimant's limitations.  Id.  In order

for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that

hypothetical must correspond to conclusions that are supported by the outputs from the medical

authorities.  Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).  To

ensure that correspondence, the Administrative Law Judge must both clarify the outputs,

deciding what testimony will be credited and resolving ambiguities, and accurately transmit the

clarified output to the expert in the form of assumptions.  Id.

Because the ALJ properly rejected Dr. Gaftanyuk's opinion, the hypothetical posed to the vocational expert, based on Dr. Gaftanyuk's opinion, is irrelevant.  Because the ALJ's RFC finding was supported by expert medical evidence, the testimony elicited from the vocational expert stating that Plaintiff could perform past relevant work based on that RFC is substantial evidence.  Therefore, the ALJ did not err in relying on this testimony.

## CONCLUSION

For the aforementioned reasons, Plaintiff's Motion to Remand (Docket #18) is DENIED, and the Commissioner's Motion to Affirm (Docket #23) is GRANTED.

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge